IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BENEFITELECT, INC.,
COMMUNICATION PARTNERS, INC.,

          Plaintiffs,

v.

STRATEGIC BENEFIT SOLUTIONS
CORPORATION,

          Defendant.

_____

Lead Case No. 6:19-cv-00797-MC
Member Case No. 6:20-cv-01266-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

      Plaintiffs BenefitElect, Inc. and Communication Partners, Inc. bring suit under Oregon contract law against a former work partner, Defendant Strategic Benefit Solutions Corporation. Pls.' Second Am. Compl., ECF No. 40 ("SAC"). Plaintiffs bring claims for breach of contract, promissory estoppel, and unjust enrichment based on an alleged commission split fee agreement between the parties. SAC ¶¶ 6–16. Defendant moves for summary judgment on all claims. Def.'s Mot. Summ. J., ECF No. 54. Because Plaintiffs fail to demonstrate mutual assent to the split fee agreement, and fail to establish that Defendant was unjustly enriched, Defendant's Motion for Summary Judgment (ECF No. 54) is GRANTED.

1 – OPINION AND ORDER

## BACKGROUND

Plaintiffs and Defendant are corporations in the insurance benefits industry. In 2017, MetLife, a global insurance company, awarded Defendant the position of MetLife's designated "Small Diverse Business." Spiegel Decl. Ex. 4, at 1, ECF No. 55. In this position, Defendant would serve as the administrator of benefits and enrollment under a five-year voluntary benefits contract with the Commonwealth of Pennsylvania. *Id.* Based on their lengthy professional history, Defendant contacted Plaintiffs about providing the necessary technological support in order for Defendant to perform its contract with MetLife. Spiegel Decl. Ex. 33. Plaintiffs agreed to construct and operate the benefits computer program which would assist Pennsylvania state employees in obtaining insurance. *Id.* Both parties expressed hopes that this project could serve as an opportunity for future business endeavors with MetLife. Spiegel Decl. Ex. 17; Phan Decl. ¶ 20, ECF No. 56.

Some costly errors by Plaintiffs during the commencement of the enrollment period resulted in MetLife's forfeiture of premiums. Spiegel Decl. Ex. 23, at 1–2; *see also* Spiegel Decl. Ex. 6, at 1. The relationship between the parties continued to sour when they could not agree to the amount of compensation for Plaintiffs' work. Plaintiffs allege they had a commission splitting agreement with Defendant, under which Plaintiffs are owed $912,000 for their work. SAC ¶¶ 10, 14, 16. Because the agreed compensation structure is at issue, below is a synopsis of the relevant provisions and communications between the parties.

MetLife compensated Defendant through a flat commission on policies sold via Defendant's platform. Phan Decl. ¶ 25. The commission structure allocated 20% to Defendant and 3% to the technology provider, Plaintiffs, as a platform fee. *Id.*; *see also* Spiegel Decl. Ex. 7. The parties consented to 3% on the current project but planned to request 5% going forward.

Spiegel Decl. Ex. 10, at 1. Defendant also paid Plaintiffs' setup fees and postage expenses, as per their arrangement. Phan Decl. ¶ 28–30. The issue that brings the parties to court presently is the disputed existence of an agreement to share 50% of the total commissions paid to Defendant over the life of the contract. Pls.' Resp. Def.'s Mot. Summ. J. 6, ECF No. 59. On May 14, 2018, several months after Defendant contacted Plaintiffs regarding the MetLife work, Plaintiffs emailed Defendant stating they "propose a 50% commission split" for various services related to managing enrollments. Spiegel Decl. Ex. 16. Defendant responded on May 21, 2018, asking if Plaintiffs would "feel comfortable waiting to see where we stand after the Fall enrollment." Spiegel Decl. Ex. 17. Plaintiffs responded the following day, agreeing to "defer firming up a fee split until after the initial July enrollment." *Id.* Despite Plaintiffs' assertions otherwise, Defendant maintains that an agreement was never met and any conversations regarding a commission split were mutually deferred until after enrollment, at which point Defendant declined the split. Def.'s Mot. 16–23.

On May 1, 2019, Plaintiffs' counsel contacted Defendant and demanded payment in full, threatening to file suit if payment was not received within five business days. Hansen Decl., Ex. 1, at 1, ECF No. 27. Plaintiffs initially filed in Oregon alleging breach of contract and other related claims, but Defendant already filed suit in New Jersey alleging tortious interference and seeking declaratory relief on the alleged contract between the parties. Opinion and Order 2–3, ECF No. 31. Defendant moved to dismiss Plaintiffs' claims pursuant to the "first-to-file" rule. *Id.* However, on December 23, 2019, this Court refused to dismiss the claims because of jurisdictional considerations and instead stayed the case to allow resolution of the New Jersey case. *Id.* at 7–8. Before ruling on the merits, the New Jersey case was transferred to this Court and consolidated with Plaintiffs' case.

**STANDARD OF REVIEW**

The court must grant summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247–48. Rather, the non-moving party must proffer evidence that could reasonably affect the outcome of the suit. *Miller*, 454 F.3d at 988.

**DISCUSSION**

Defendant moves for summary judgment on all three of Plaintiffs' claims: breach of contract, promissory estoppel, and unjust enrichment. The Court addresses each in turn.

**I. Breach of Contract**

Plaintiffs allege that a contract existed between the parties which obligated Defendant to share 50% of the MetLife commissions with Plaintiffs. Pls.' Resp. 18. Plaintiffs argue that Defendant orally agreed to share 50% of the commissions throughout a series of phone conversations, which were later recorded in Plaintiffs' emails and proposals. *Id.* Defendant

maintains that no oral contract was formed because it never agreed to the 50% commission split. Def.'s Mot. 32.

The party alleging breach must first establish the existence of an enforceable contract. *Holdner v. Holdner*, 29 P.3d 1199, 1203 (Or. Ct. App. 2001). Whether an enforceable contract exists is a matter of law in Oregon. *E.g.*, *State ex rel. Key W. Retaining Sys., Inc. v. Holm II, Inc.*, 59 P.3d 1280, 1283 (Or. Ct. App. 2002). To be enforceable, there must be a manifestation of mutual assent. Restatement (Second) of Contracts § 17 (Am. Law Inst. 1981). Oregon courts employ the objective theory of contracts for this assessment. *Glob. Exec. Mgmt. Sols., Inc. v. Int'l Bus. Machs. Corp.*, 260 F. Supp. 3d 1345, 1367 (D. Or. 2017). Under this theory, courts determine the existence of a contract by examining "the parties' objective manifestations of intent, as evidenced by their communications and acts," rather than their subjective intent. *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 120 P.3d 6, 11 (Or. Ct. App. 2005). "When the dispute concerns an unwritten agreement, the conclusion that the parties manifested mutual assent must be constructed from evidence of their negotiations or other past conduct." *Kabil Devs. Corp. v. Mignot*, 566 P.2d 505, 509 (Or. 1977).

In examining the parties' past acts, no reasonable jury could find sufficient evidence of Defendant's assent to the 50% commission split. As the proponent of the contract, Plaintiffs provide no proof of a definitive phone conversation or statement wherein Defendant manifested assent to the 50% split terms. Instead, they rely on what is "indicated in the declarations of Chris and Douglas Lonergan," Owner and CEO of the Plaintiff companies, as support for the existence of some oral agreement. Pls.' Resp. 18. Such support is not found, however, because the testimony belies any conclusion that clear acceptance was conveyed by Defendant. When asked to pinpoint when the parties agreed to the commission split, Douglas Lonergan testified there

were "many phone calls" but he could not recall the specific "dates and content." Spiegel Decl. Ex. 1, at 13. When asked about the wording of Defendant's acceptance to the commission split, Chris Lonergan said he couldn't "remember specifically what word" or phone call reflected it, but that there were a lot of conversations about "deferring . . . the conversation." Spiegel Decl. Ex. 2, at 13. When asked what indicated Defendant's acceptance, Douglas Lonergan explained that it was inferred from Defendant's permission to move forward on the project after proposals had been issued. Spiegel Decl. Ex. 1, at 14. Plaintiffs' testimonial timeline is also unconvincingly vague[1] and inadequate when compared to Defendant's pre-litigation statements that no such agreement occurred.[2] In this regard, Plaintiffs fail to show any requisite objective manifestations of Defendant's intent to be bound by the 50% split terms.

      Plaintiffs also attempt to support the contract's existence by pointing to subsequent emails and proposals, claiming them as evidentiary records of the alleged contract. Pls.' Resp. 18. But these communications do not reveal Defendant's assent. All subsequent correspondence—May 7, May 14, and June 15—refers to the 50% split as merely a proposal from Plaintiffs to Defendant. *Id.*; Spiegel Decl. Ex. 16. Repeating a proposal is tantamount to repeating a request. And here, Defendant never manifested assent to the terms of that request. In fact, all evidence points to the contrary. Looking at the record in its entirety, the May 14th email is the first substantiated record of Plaintiffs "propos[ing] a 50% commission split" to Defendant. Spiegel Decl. Ex. 16. Defendant responded with a request to wait and "see where [they] stand

---

[1] In the complaint and Chris Lonergan's testimony, the alleged acceptance occurred in March 2018. Pls.' Resp. 6; Spiegel Decl. Ex. 2, at 12. In Douglas Lonergan's testimony, the alleged acceptance occurred in June or May 2018. Spiegel Decl. Ex. 1, at 12. In his declaration, Chris Lonergan testified to additional acceptance during May 2018. C. Lonergan Decl. ¶ 6, ECF No. 62. Conversely, in an email from 2020, Douglas Lonergan admitted that the parties "defer[red] agreeing to terms until after the project's completion." Brooks Decl. Ex. 1, at 1, ECF No. 67.

[2] On January 7, 2019, Le Phan emailed Plaintiffs and others: "Under no circumstance did we ever agree that a 50-50 case split would be amenable. What we did agree upon was to revisit how the case looked with participation upon conclusion of the second round of enrollment." Spiegel Decl. Ex. 33, at 1.

after the Fall enrollment." Spiegel Decl. Ex. 17, at 2. Plaintiffs in turn agreed to "defer firming up a fee split until after the initial July enrollment." *Id.* at 1. Even at the conclusion of their project, the negotiations make clear that Defendant did not assent. After enrollment, Plaintiffs inquired "whether [Defendant] will also be sending a check for the commission split." Spiegel Decl. Ex. 29, at 1. Defendant responded, acknowledging the postponement of the decision and asked what Plaintiffs had in mind. *Id.* Plaintiffs answered that they felt "a 50/50 commission split is fair." *Id.* Plaintiffs' repeated requests to establish terms regarding the commissions reveal their understanding that Defendant had not yet assented to the 50% split.

Because the evidence contains no manifestations of mutual assent, the Court finds no contract as to the commission split terms. Both parties raise the Statute of Frauds; however, because the Court finds no contract, it is not applicable here. Summary judgment is granted on this claim.

## II. Promissory Estoppel

In the alternative, Plaintiffs argue Defendant should be estopped from claiming there was no agreement and thus no obligation to reimburse Plaintiffs for their efforts on the MetLife project. SAC ¶ 13.

In Oregon, promissory estoppel is not an independent cause of action but rather a substitute for consideration, providing a basis upon which a promise may be enforced when the promisee has detrimentally relied. *Natkin & Co. v. H.D. Fowler Co.*, 876 P.2d 319, 321 (Or. Ct. App. 1994) (citing *City of Ashland v. Hoffarth*, 733 P.2d 925 (Or. Ct. App. 1987)). Promises that are found indefinite or incomplete can still lead to recovery "under appropriate circumstances."[3]

---

[3] Whether the circumstances are appropriate to grant relief on an indefinite promise is subject to court discretion. *See Neiss v. Ehlers*, 899 P.2d 700, 703 (Or. Ct. App. 1995) ("[T]he question of whether promissory estoppel *can* apply to indefinite agreements is 'close.' There is no controlling Oregon authority, and the courts of other jurisdictions which have addressed the question are divided.").

7 – OPINION AND ORDER

*Neiss v. Ehlers*, 899 P.2d 700, 707 (Or. Ct. App. 1995). To recover, a plaintiff must show "(1) a promise, (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position." *E.g.*, *Bixler v. First Nat'l Bank of Or.*, 619 P.2d 895, 899 (Or. Ct. App. 1980). Recovery is only attainable where "no traditional contractual remedy is available for the nonperformance." *Neiss*, 899 P.2d at 706.

Here, the issue lies in the first element: a promise. Plaintiffs' claim rests on their unsupported allegation that Defendant orally promised to split commissions. Pls.' Resp. 28. They attempt to prop-up this allegation by citing to case law establishing the enforceability of an indefinite promise. *Id.* Nonetheless, the issue here is not that Defendant's promise was indefinite but that there is simply no proof that Defendant issued a promise to Plaintiffs. As explained above, Plaintiffs offer no probative evidence of a phone conversation or statement during which Defendant promised to share 50% of the MetLife commissions. Without specifying how, when, or where, Plaintiffs' response merely states that "Defendant . . . promised to evenly split its commissions with [P]laintiffs in the oral communications between the parties." *Id.*

What's more, all subsequent negotiations belie Plaintiffs' allegation that an oral promise was made. According to Plaintiffs' timeline, the oral promise was issued in March 2018. *Id.* That promise was "later confirmed in writing in May and June 2018." *Id.* However, the writings from May and June do not reflect any record of terms previously guaranteed by promise or otherwise. On the contrary, in the text of the May email, Plaintiffs "propose[d] a 50% commission split." Spiegel Decl. Ex. 16. Applying plain meaning to that email, it reads as though Plaintiffs are still seeking some type of guarantee from Defendant to secure the 50% split terms––much like a promise would provide. It defies logic to conclude from this proposal that the exact

terms being solicited were previously guaranteed. Because the Court is not convinced that a proposal is anything more than a request, it declines to view this retroactive email as evidence that a promise was already issued. Conclusively, Plaintiffs' promissory estoppel claim is based on vague, unsupported assertions insufficient to return a jury verdict.

Accordingly, the Court grants summary judgment on this claim.

### **III. Unjust Enrichment**

Lastly, Plaintiffs bring a claim against Defendant for unjust enrichment, requesting reimbursement for the reasonable value of Plaintiffs' work performed on Defendant's behalf during the MetLife project. SAC ¶ 16.

Plaintiffs rely on the theory of quantum meruit to pursue their unjust enrichment claim, requesting the reasonable value of their services as relief. A quantum meruit claim "seeks compensation for services rendered in the expectation of payment, but in the absence of explicit agreement as to amount." *In re Klemp*, 418 P.3d 733, 741 (Or. 2018) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 31 comment e (2011)). While Oregon's Supreme Court recognizes two distinct theories of quantum meruit, only the "implied in law" theory is relevant here. *Id.* Under that theory, "the court may be unable to find an implied promise to pay but will impose an obligation to pay a reasonable price . . . 'as necessary to prevent unjust enrichment.'" *Id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment § 31 comment e (2011)).

For claims of unjust enrichment, Oregon's Supreme Court utilizes a case-by-case analysis, replacing its previous formulaic approach. *Larisa's Home Care, LLC v. Nichols-Shields*, 404 P.3d 912, 918–21 (Or. 2017). Courts are directed to "examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to

9 – OPINION AND ORDER

determine whether any particular enrichment is unjust." *Id.* at 921. In so ruling, Oregon's Supreme Court established that the Restatement (Third) of Restitution and Unjust Enrichment (2011) is proper authority when considering whether unjust enrichment allegations fall within an established category. *Id.* at 921–22; *see also The Hoag Living Trust v. Hoag*, 424 P.3d 731, 738 (Or. Ct. App. 2018).

Here, Plaintiffs allege their claim for unjust enrichment falls under an established category in the Restatement, § 31 Unenforceability:

> (1) A person who renders performance under an agreement that cannot be enforced against the recipient by reason of
> (a) indefiniteness, or
> (b) the failure to satisfy an extrinsic requirement of enforceability such as the Statute of Frauds,
> has a claim in restitution against the recipient as necessary to prevent unjust enrichment. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.

Restatement (Third) of Restitution and Unjust Enrichment § 31 (2011). To explain how their case fits within § 31, Plaintiffs cite to three Oregon contracts cases "where one party conferred a benefit on another but was unable to enforce an express agreement regarding payment because of a failure of proof or other obstacles to enforcing the express agreement." *Jones v. Four Corners Rod & Gun Club*, 456 P.3d 616 (Or. 2020); *see Baker v. First Nat'l Bank*, 293 P.2d 742 (Or. 1956); *see Kolve v. Maid Rite Shops, Inc.*, 577 P.2d 502 (Or. 1978).

In *Baker*, a decedent failed to pay the plaintiff for lodging and household services she provided prior to his death. 293 P.2d at 743. The court allowed relief for reasonable value of services, emphasizing the "understanding that the plaintiff's services were not gratuitous, but that she was to be compensated." *Id.* at 744. In *Kolve*, a landlord sought relief from tenants who occupied his restaurant premises without a rental arrangement. 577 P.2d at 503. The court

allowed relief for reasonable rental value, stating that following the tenants' full use of the premises, "[i]t could hardly come as any surprise" to the tenants that a court would order them to pay compensation. *Id.* at 504. In *Jones*, an employer provided an employee valuable lodging in exchange for services. 456 P.3d at 627. The court held that the employer's counterclaim was appropriate because the employee "understood he was expected to provide something of value to compensate" the employer for the lodging benefit. *Id.* The court also noted the inadequacy in the value of services offered to the employer when compared to the market rental value of the lodging. *Id.*

In all three cases, the court emphasized the dual importance of adequate compensation and mutual expectations. When one party consumed the services of another and provided nothing in return despite the overarching expectation of some valuable exchange, the court deemed this unjust and worthy of equitable relief in the sum of reasonable value of services. Applying this framework to the facts here, the Court is unpersuaded that Defendant was unjustly enriched. Plaintiffs' services were not consumed without payment and did not run astray from the parties' demonstrable expectations. Defendant paid Plaintiffs for their services consistent with agreed upon negotiations. As per their terms, Plaintiffs were paid the 3% platform fee, $7,500 for set-up costs, $3,500 for video expenses, and over $32,000 for postage expenses. Def.'s Mot. 42. The only payment expected but not received is the 50% commission share. And as explained, nothing supports the legitimacy of that expectation. Nor is this a case of inadequate compensation. The record reflects that a 1–3% platform fee is standard in the industry, which Plaintiffs received. Spiegel Decl. Ex. 8, at 2; Spiegel Decl. Ex. 36, at 1; Pls.' Resp. 32. The above cases are factually distinct from the situation here and do not support Plaintiffs' claim for unjust enrichment.

Beyond the case analysis, Plaintiffs' similarly fail to fit within § 31 of the Restatement. To qualify for unenforceability, restitution must be "necessary to prevent unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 31 (2011). While broadly applied, unjust enrichment fundamentally refers to returning to the plaintiff "something which in equity and good conscience did not belong to the defendant." *Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Ass'n*, 577 P.2d 477, 492 (Or. 1978). Because Plaintiffs and Defendant conducted themselves according to the agreed upon stipulations, the Court does not see how Defendant was enriched with something that did not belong to it. Payments were exchanged in accordance with the agreed upon terms. Additionally, the record is riddled with Plaintiffs' statements acknowledging that they had not secured an agreement on the commission split and their team would be losing money on the MetLife deal.[4] The appeal was not just the first-enrollment profits but the possibility of a long-term relationship with MetLife. An appealing prospect which Plaintiffs severed when they chose to cut ties with Defendant. Perhaps it is true that Defendant is disproportionately enriched by retaining a relationship with MetLife, the coveted end-goal. However, Defendant's enrichment cannot be deemed unjust because Plaintiffs were not forced off the project; rather, Plaintiffs removed themselves.

Plaintiffs have failed to establish that Defendant was unjustly enriched.

## **CONCLUSION**

For the above reasons, Defendant's Motion for Summary Judgment (ECF No. 54) is GRANTED on all claims.

---

[4] *See* Def.'s Mot. 13–14 (explaining and citing the long-term versus immediate benefits from Plaintiffs', Defendant's, and MetLife's perspective).

**IT IS SO ORDERED.**

DATED this 13th day of July, 2022.

      /s/ Michael McShane

Michael McShane

United States District Judge

13 – OPINION AND ORDER